**Candelaria CUELLO SUAREZ, et al., Plaintiffs,**

v.

**PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA), Defendant.**

**Civ. No. 88–0133(PG).**

United States District Court D. Puerto Rico.

June 29, 1992.

A. Santiago–Villalonga, Santurce, Puerto Rico, for plaintiffs.

Karen M. Loyola–Peralta, San Juan, Puerto Rico, for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

### I. *Introduction*

This multi-headed action combines (1) a claim of employment discrimination on the basis of nationality pursuant to § 703 of the Civil Rights Act of 1964, 42 U.S.C. 2000e–2 ("Title VII"), (2) the local counterpart of Title VII—Law 100 of June 30, 1959, as amended, 29 L.P.R.A. § 146 ("Law 100" or "§ 146")—and (3) a claim under 42 U.S.C. § 1981 ("§ 1981"), which guarantees "the right to make and enforce contracts." Plaintiffs also seek reasonable attorney fees pursuant to 42 U.S.C. § 2000e–5(g).

## II. *Findings of Fact*

For a detailed analysis of the facts, the Court refers the avid reader to the unfathomable depths of the archives of the Clerk's Office. The salient facts as they pertain to a resolution of the legal issues presented by the parties in their post-trial briefs are as follows.

Plaintiff Candelaria Cuello Suárez ("Ms. Cuello"), is a national of the Dominican Republic, residing in the Commonwealth of Puerto Rico. Ms. Cuello holds a B.A. in Business Administration with a concentration in accounting. She is also a licensed C.P.A.[1]

Defendant, Autoridad de Energía Eléctrica de Puerto Rico ("PREPA"), is a public corporation with legally cognizable standing, properly incorporated pursuant to the laws of the Commonwealth of Puerto Rico. Employing more than 15 employees and affecting interstate commerce, it is an employer as such term is defined at 42 U.S.C. § 2000e(b); Defendant's Post Trial Brief ("Def['s] Br.") at ¶ 3.

■ Ms. Cuello was hired by PREPA on July 6, 1971. She has been at all times an employee in good standing, receiving above average performance reviews on all her evaluations. Since 1971, Ms. Cuello has taken and approved a variety of tests required for promotion. These include: general classification, administrative aptitude, consumer services clerk, mathematics, chemistry, aptitude, typing, psychological evaluation, accounting and specialist in accounting systems. *See* Plaintiffs' Exhibit ("Pls['] Exh.") 9(a). Between 1981 and 1987, Ms. Cuello applied and was rejected

for a total of 77 managerial/supervisory positions. *See* Pls['] Br., p. 3; *see also* Pls['] Exh. 9(a). Although there is some dispute as to her qualifications for some of the positions, *see* Def['s] Br., ¶ 12, and even though defendant emphasizes that some of the positions were phased out before they could be filled, it is largely undisputed that as of 1989, Ms. Cuello applied and was turned down for dozens of managerial positions even though she was, in many instances, overqualified.[2]

On or about July 29, 1987, plaintiffs filed a claim of discrimination on the basis of national origin with the New York Office of the Equal Employment Opportunity Commission and the Director of the Anti–Discrimination Unit of the Department of Labor and Human Resources of the Commonwealth of Puerto Rico. The Anti–Discrimination Unit issued a right to sue letter on December 29, 1987. Plaintiffs' Amended Complaint, ¶¶ 11, 12, 16.

On January 26, 1988, plaintiffs filed with this Court the allegations which form the core of this action. Subsequent to the initiation of these proceedings, Ms. Cuello applied for a managerial position as Supervisor of Consumer Services. Although Ms. Cuello had eighteen years experience in the area and exceeded the requisite academic qualifications, the position was awarded to a person with only two years experience and a B.S. in Biology.

### A. Trial

During trial and as a means of establishing the *prima facie* case, plaintiffs intro-

---

**1.** Ms. Cuello obtained her C.P.A. in 1989. At the relevant times in this suit Ms. Cuello already had passed portions of the C.P.A. exam.

**2.** PREPA tries to soften the impact of the overwhelming numbers by arguing that, in some instances, it advertized openings for same managerial positions in different areas of the island. Defendant argues that Ms. Cuello—who applied for the same management position in different areas of the island—is wrong in concluding that each rejection is an independent, continuing violation of the law. Rather, defendants contends, they must be counted as one application. Not only is this argument without merit, but the same only buttresses plaintiffs' case.

Every chance that Ms. Cuello had of obtaining employment constitutes an independent cause of action. When she applied "en masse" for the same position in different geographical areas, she was rejected "en masse" not for just one position in one area but for each position in all available areas. If she was rejected for, lets say, a supervisory position in San Juan because she was not the best candidate, she still had an independent chance of landing the same job in another part of the island. Given her academic and professional preparation, it is beyond belief, as we shall see below, that a better qualified employee existed every time she applied for a supervisory position.

duced a comparative composite of all the jobs that Ms. Cuello applied for and the persons to whom the same were eventually awarded. *See* Pl.['s] Ex. 9(a). Those individuals who eventually occupied the positions Ms. Cuello applied for fall within three easily distinguishable categories: less experienced, less qualified, and unqualified. Falling in the unqualified category were those employees who were awarded the position after occupying the same on a temporary basis.

At trial and in its brief, PREPA argues that these employees were selected because they had experience in the jobs they were ultimately awarded. At trial, plaintiffs countered that PREPA's "grooming" of unqualified individuals was and is a backhanded way of excusing PREPA's decision not to select her on the basis of her place of origin.

Evidence introduced at trial supports this contention. At trial, the evidence disclosed that PREPA regularly hired temporary, unexperienced employees to fill positions that were later opened for applications. However, these positions were invariably filled by the same temporary employees PREPA initially hired with the intent of later claiming that they had the necessary experience and qualifications they lacked in the first place. *See, e.g.,* Pls.['s] Ex. 6. This practice, plaintiffs contend, was and is still being used as an excuse to deny promotion to Ms. Cuello.

At trial, PREPA challenged Ms. Cuello's contention by introducing evidence of its facially neutral selection process. Offered as evidence were documents evidencing the neutral selection procedures and affirmative action programs in force at PREPA. According to PREPA regulations, vacant managerial positions or newly created positions

... classified under the grade of MI to MV [ (managerial level positions) ] are simultaneously published in all the dependencies of the Authority for a period of ten (10) calendar days.... *The interested supervisor selects the one that he/ she considers to be the best candidate in accordance to the effective norms and in accordance to the following priority order:*

a) Regular and temporary managerial employees with one or more years of service with the authority.
b) Non–Regular employees.
c) Candidates from the Registry of Eligibles.

*See* Def's Exhibit 13, General Employment Norms. (Emphasis supplied).

Further evidence disclosed that PREPA's affirmative action program guarantees

... employment and personnel practices ... [offering] equal opportunity for everyone ... [making] full and effective utilization of qualified persons, regardless of race, age, color, religion, sex, national origin, and mental or physical disability.

... [and that] all matters related to recruiting, hiring, training, compensation, benefits, promotions, transfers, layoffs, recall from layoffs, company-sponsored educational, social, and recreational programs and all behavior on the job [are] free of discriminatory practices.

*See* Def. Exh. C, Affirmative Action Plan, p. 1.

Keenly aware that facially neutral selection criteria is a poor breakwater against claims of intentional discrimination or disparate impact cases, PREPA argued that, if anything, plaintiffs' claim was not one of discriminatory treatment but of discriminatory impact. The claim, defendant contended, fails because plaintiffs do not present evidence that establishes a pattern of discrimination.

Following on this vein, defendant sought to vanquish plaintiffs' *prima facie* case by introducing evidence of supervisory jobs awarded to nationals of the Dominican Republic. *See* Def. Exh. D(1). According to PREPA's summary of foreign employee records, a total of five nationals from the Dominican Republic occupied supervisory jobs at the time of trial. *See* Def.Exh. D(1), D(3). This evidence was basically endorsed and repeated at trial by José A. del

Valle Vázquez, Executive Director of Finance at PREPA. What defendant self-servingly omits from its analysis of the data is that these Dominican nationals were all in highly technical field-jobs outside the office.

PREPA also attempts to mitigate the impact of Ms. Cuello's *prima facie* case by introducing evidence that she did not have the qualifications necessary for eight of the seventy-seven (77) positions she applied for. Finally, as an explanation for its continued failure to promote Ms. Cuello, PREPA argues that it did not discriminate against Ms. Cuello but merely underutilized her abilities and qualifications.

## III. *Legal Theories: Post Trial Briefs*

In its post trial brief, PREPA raises a series of procedural and legal barriers to plaintiffs' Title VII, § 1981 and Law 100 claims. First, defendant seeks to re-cast Ms. Cuello's discriminatory treatment claim as one of disparate impact, indulging in the fantasy that this Court will somehow confound the two and make it easier for defendant to prevail. Def['s] Br., pp. 5–13. Second, defendant contends that under the new analysis of § 1981 announced in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), promotion to a supervisory position does not constitute a new contract between the parties and is therefore not sufficient to state a claim for which relief can be granted under § 1981. *Id.*, p. 15. Third, defendant contends that under 42 U.S.C. § 1981 discrimination solely on the basis of national origin is not actionable. *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). Finally, defendant states that evidence introduced at trial does not suffice to find a violation of Law 100.[3] *Id.*, at p. 16.

Unimpressed by this three pronged attack, plaintiffs merely state that the proof presented at trial is sufficient to recover under the three causes of action.

**3.** Amazingly, defendant's treatment of the state law claim is circumscribed to the naked statement "No case was established under Law 100

## IV. *Conclusions of Law*

■ By its terms, Title VII proscribes employer discrimination on the basis of race, color, religion, sex or national origin. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Overt and covert discrimination practices are banned by Title VII, protecting individuals against overt practices exhibiting discriminatory motive or intent as well as facially neutral employment practices which are discriminatory in effect.

■ Two legal theories are available for employees seeking redress for discriminatory practices: disparate treatment and disparate impact. The disparate treatment theory allows plaintiffs to obtain redress for employment practices exhibiting invidious discriminatory intent. By contrast, disparate impact seeks to redress the effects of facially neutral practices that result in the disproportionate exclusion of members of the protected class. *Compare Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) *with McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As stated by Justice Burger in *Griggs:* "[Title VII] proscribes not only overt discrimination but also practices that are fair in form but discriminatory in operation." 401 U.S. at 431, 91 S.Ct. at 853.

### A. Disparate Impact

■ Under disparate impact theory the plaintiff must establish that a facially neutral practice has a significant discriminatory impact. *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982). The *prima facie* case hinges on plaintiffs' ability to identify the specific employment practice that results in discriminatory impact on a particular class, *see Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989), *citing Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), as well as "... identify the employment crite-

of June 30, 1959," and a citation of the case *Ibáñez v. Molinos*, 114 P.R.R. 42 (1983).

ria responsible for statistical disparities. A mere show of statistical imbalance will not be enough." *Wards Cove*, 490 U.S. at 651–52, 109 S.Ct. at 2122. The employee must show that "... the percentage of selected applicants who are non white [is] significantly less than the percentage of qualified applicants who are non white...." *Id.*, at 653, 109 S.Ct. at 2123.

■ Once the employee meets this demanding requirement, defendant carries the burden of producing evidence that the alleged neutral practice has a manifest relationship to the employment in question. *Connecticut v. Teal, supra*, 457 U.S. at 446, 102 S.Ct. at 2530.[4] The plaintiff then has the opportunity to demonstrate that the employer's practice is a mere pretext. *Id.*, at 446–47, 102 S.Ct. at 2530.

As if this highly technical, convoluted process were not enough, prior to the passage of the Civil Rights Act of 1991 (and thus the law applicable to this case), the employer was able to counter the employees' *prima facie* articulating "any business justification," *Wards Cove*, 490 U.S. at 658, 109 S.Ct. at 2125, for the discriminatory employment practice. The employees were then forced to establish that the business justification offered by the employer was a mere pretext. This legal hurdle often forced employees to wear two hats: that of an aggrieved employee as well as that of an experienced employer. Employees found themselves in the unnatural position of having to convince the trier of fact that the business reason proffered by the employer was a mere pretext and/or that other practices could equally serve the employer's business interest while eliminating the unlawful discriminatory effect. *Wards Cove*, at 660, 109 S.Ct. at 2126. The employee was further disadvantaged by the Supreme Court's admonition that the employer—not the court or the employees—was better qualified to determine which

practices best fit his needs.[5] *Id.*, at 661, 109 S.Ct. at 2127.

### B. Disparate Treatment

■ By contrast, disparate treatment remains the staple of fewer though numerically relevant discriminatory practice cases. As disparate impact cases, the plaintiff in a disparate treatment case bears the burden of establishing a *prima facie* case of racial discrimination. *See, e.g., Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207; *see also White v. Vathally*, 732 F.2d 1037 (1st Cir.), *cert. den.* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984). This burden is met by establishing that plaintiff belongs to a racial minority, that he/she applied for a job opening for which he was qualified, that despite being qualified he was rejected, and that following his rejection, the position remained open for applicants of the same qualifications. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The *prima facie* case may be established by circumstantial evidence capable of creating an inference that the employment decision was based on illegal criteria. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, n. 44, 97 S.Ct. 1843, 1866, n. 44, 52 L.Ed.2d 396 (1977).

■ Once the *prima facie* is established, the employer is saddled with the light burden of articulating some "legitimate, nondiscriminatory reason for the employees rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. In other words, the employer must produce admissible evidence allowing the trier of fact to conclude that the decision was not motivated by impermissible discriminatory criteria. This burden is not one of persuasion but of production of a legitimate reason. The trier of fact ultimately makes a credibility assess-

---

**4.** The "manifest relationship test" was reinstated by Congress when it overruled the Supreme Court's decision in *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). As the Civil Rights Act of 1991 was meant to codify the law as it existed prior to the *Wards Cove* decision, the Court

understands that the applicable test on this point at the time the suit was instituted is found in *Teal*.

**5.** The Civil Rights Act of 1991, 42 U.S.C. § 1981(a), flatly rejected the approach espoused by the Supreme Court in *Wards Cove*.

ment. *See Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984), *citing United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *see also Cartagena v. Secretary of Navy,* 618 F.2d 130 (1st Cir.1980). The purpose of this shifting burden is to ensure the presentation of evidence in a manner that highlights material issues of fact to the jury. *See Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64 (1st Cir.), *cert. den.* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

■ Finally, following the enunciation of a legitimate reason by the employer, plaintiff may rebut by convincing the trier that the reason is merely pre-textual and that a discriminatory reason more likely served as motivation. In this respect, the issue is one of credibility that the trier of fact will determine. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 257, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981).

Notwithstanding defendant's unsubstantiated and self-serving conclusion to the contrary, *see* Def.['s] Br., p. 6, plaintiffs' claim is one of disparate treatment.

■ As stated above, the trial of the case disclosed that Ms. Cuello—a Dominican national with legal residence in Puerto Rico—was either qualified or overqualified for most of the positions she applied for. From 1981 to 1989, Ms. Cuello applied and received rejections for over 77 supervisory positions. The evidence presented substantiates Ms. Cuello's claim that the positions were awarded to less qualified applicants of Puerto Rican nationality or ethnic background. Although defendant shows that it employs a total of five Dominicans, the same are in highly technical field jobs, not office jobs.[6]

As further circumstantial evidence of PREPA's discriminatory intent, Ms. Cuello entered uncontroverted evidence that of the 11,000 employees at PREPA only seven, including Ms. Cuello, had, at any time, a C.P.A. license. Included in these seven, were officials at the highest levels of PREPA. This coincidence is too much to stomach. To add insult to injury, Ms. Cuello also narrated how she applied for Supervisor of Consumer Services in Training, a managerial position in the division she had worked for 18 years. As in other cases, though the job description expressed a preference for candidates with a B.B.A., the same was awarded to a person with a mere seven months experience and a B.S. in Marine Biology. The overwhelming evidence presented at trial leads this Court to conclude that plaintiffs firmly established a *prima facie* claim of intentional discrimination.

Turning to the second step in the process—the offering of a legitimate business reason—PREPA first attempted to meet its burden of production by establishing that Ms. Cuello applied for eight positions for which she was not qualified. *See, e.g.,* Def.['s] Br., ¶ 9–a. Defendant then called this Court's attention to the fact that Ms. Cuello applied for a position as Supervisor Consumer Services in Training even though Ms. Cuello occupied the position of Clerk of Consumer Services in Training. As clerk, PREPA noted, Ms. Cuello performed tasks similar to the ones she would have performed as supervisor. PREPA then contended that her application was for a position identical to the one she was performing. Thus, she could not assert a cause of action under 1981.

This argument is disingenuous and without merit. It may well be that PREPA takes advantage of employees at the lower end of the totem pole by requiring them to perform work at higher levels without the benefit of the corresponding rank, salary and conditions of employment associated it. This does not imply that the job content of a clerk is the same as that of supervisor or that the supervisor has the same responsibilities or enjoys the same discretion as a

---

6. Defendant conveniently confounds disparate treatment with impact cases and happily asserts that it employs a total of five Dominican nationals as evidence that it does not have a discriminatory policy on the basis of nationality. It is worthy of notice, that even were this case one of disparate impact (which it is not), bottom line racial balance does not preclude an action under Title VII. *Connecticut v. Teal,* 457 U.S. 440, 450, 102 S.Ct. 2525, 2532, 73 L.Ed.2d 130 (1982).

clerk. That PREPA may choose thus to exploit its lower-end employees by requiring that they perform tasks reserved for supervisory positions does not magically dissolve the two positions into one.

PREPA emphasizes that Ms. Cuello was not qualified for eight of the 77 positions she applied for but still included the same as part of the managerial positions not awarded to her. PREPA also asserts that there is "underutilization of certain employees who are in their present jobs" and that "there is no job position in PREPA requiring a CPA license in order to qualify for the position." *See* Def. Brief, p. 5.

These assertions miss the point. While it is entirely credible that PREPA, or, for that matter, any other corporation may underutilize qualified individuals in its payroll, the irrefutable evidence is that Ms. Cuello was continuously rejected for the positions she applied for and less qualified employees—all of Puerto Rican extract—were consistently selected. Furthermore, even if Ms. Cuello was underqualified for eight of the seventy seven positions she applied for, PREPA remains silent as to the rest. This silence sounds PREPA's death knell. As the First Circuit recently stated: "... [defendant] ... has the burden of production to rebut ... [the *prima facie*] inference by articulating a nondiscriminatory reason for its actions. *If the defendant cannot give a nondiscriminatory reason, the plaintiff prevails on the basis of the prima facie claim.*" (Emphasis supplied and citations omitted). *Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194, 200 (1st Cir.1987).

■ PREPA also argues that managerial positions were awarded to employees who had experience in the area. The record does not bear this assertion. Rather, the record discloses a practice of grooming individuals by placing them temporarily in the position they were ultimately selected for as a means of facially satisfying the experience requirement. Although there is nothing wrong "in abstracto" with a practice of grooming individuals for a position, the same becomes suspect when it is used to exclude better qualified individuals on the basis of impermissible criteria such as national origin.

■ That PREPA is faced with underutilization of employee resources, that no job at PREPA has as prerequisite a C.P.A. or that as clerk plaintiff performed tasks normally reserved for supervisors falls well short of a legitimate business reason. In this Court's opinion, these are mere insubstantial reasons or pretextual justifications unworthy of credence. Plaintiffs fail continuously to address or provide an explanation for the overwhelming number of times that a qualified—indeed overqualified—individual applied for available jobs ultimately awarded to less qualified or experienced individuals of Puerto Rican extract. The inference drawn and left unrefuted by defendant's silence and/or fanciful explanations is that failure to select Ms. Cuello for 77 managerial positions responds to a pattern of intentional discrimination on the basis of her nationality.

## IV. *Serial Violation*

■ Next in the cascade attempt to foreclose liability, defendant seeks to limit liability for acts occurring prior to 1987 by asserting that the same are time-barred by the applicable statute of limitations. On this issue, defendant stands on solid ground.

Plaintiffs' theory of liability is that defendant is liable for all discriminatory acts dating back to 1981 for they form part of a continuing or serial violation. In its recent incarnation, a serial violation is a term of art referring to claims asserting the existence of a series of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong under Title VII. *Jensen v. Frank*, 912 F.2d 517, 522 (1st Cir.1990).

This case presents a picture-perfect example of the quintessential serial violation: an employee passed over for promotion on the basis of impermissible animus. A brief excursion into the law of serial violations as enunciated by the First Circuit will clarify its underpinnings.

In *Cajigas v. Banco de Ponce,* 741 F.2d 464 (1st Cir.1984), Ms. Cajigas brought a Title VII action against respondent Banco de Ponce ("the bank") for discrimination in promotion on the basis of sex. The sole issue before the court was whether Cajigas had filed an administrative claim within the applicable statute of limitation. Ms. Cajigas argued that over the period of time in question she had continuously attempted to obtain a promotion. The bank however, selected other applicants. Finally, after complaining to bank executives about the situation, Ms. Cajigas was told that she would be promoted but not at the same salary as her male counterparts. *Id.* at 469. In response, the bank argued—successfully at the district court level—that the only incident of discrimination was the initial promotion of a male counterpart and that every other incident was merely the "effect" of the promotion. *Id.* As such, the claim was time barred.

Before remanding the case to the district, the *Cajigas* court made the following observation: "... a court considering a 'continuing violation' argument must distinguish between a continuing violation and the continuing effects of a prior, yet discrete and no longer existent, discriminatory act." A continuing violation, the court continued, "... is more appropriately limited to a situation where there is no single act of discrimination taking place at an identifiable point of time outside the limitations period." *Id.,* at 470. What this Court faces today is not the consequence of an earlier, no longer existent, discriminatory act. *See* 840 F.2d 132, 137. Rather, it is a series of singular and independent discriminatory acts, each constituting a violation of Title VII.

This conclusion has a direct effect on both plaintiffs' and defendant's case. First, it must be noted that in a true continuing violation the clock is rewound for "... each discriminatory episode along the way." *Mack v. Great Atlantic and Pacific Tea Co., Inc.,* 871 F.2d 179, 183 (1st Cir.1989). However, the careful litigant will note that far from breathing new life into fossilized claims, serial or continuing violations merely freezes the tolling of the statute of limitations as to those causes of action that are still actionable. This much was made clear by the *Mack* court. In *Mack,* the First Circuit stated: "Thus, if the later violations [those not falling within the prescriptive period] are within the prescriptive period, an employee may pursue them despite the fact that earlier acts, forming part and parcel of the same pattern, have grown stale." *Id.,* 871 F.2d at 183; *see also Velázquez v. Chardón,* 736 F.2d 831, 833 (1st Cir.1984).

Were this case about the continuing effects of a prior violation, the Court would be forced to dismiss the action in its entirety as the first offense took place in 1981 and the administrative claim was first filed in 1987. Because the Court finds that a serial violation is involved, plaintiffs will obtain redress for those claims kept alive by the filing of the complaint with the local anti-discrimination unit and the E.E.O.C. As will be seen below, those claims that accrued 300 days prior to such filing are still actionable as Puerto Rico is a deferral jurisdiction. *See cf. Rosa Maldonado v. Citibank, N.A.,* No. 90–2644, 1991 WL 355051, slip. op. at 9 (D.P.R.1991). All pre–1987 claims are, at this juncture, dead beyond resuscitation. They were, however, properly introduced as evidence of discriminatory impact.

## V. *Prescriptive Period*

Under Title VII, plaintiffs must exhaust all administrative remedies before filing a complaint. 42 U.S.C.A. § 2000e–5(c). In most cases this includes (1) the filing of a charge with the local or state anti-discrimination agency within (60) days of the discriminatory activity, and (2) the filing of a claim with the Equal Employment Opportunity Commission within 180 days in non-deferral states and 300 days in a deferral state. 42 U.S.C.A. § 2000e–5(e)(1). Puerto Rico, being a deferral jurisdiction, requires that claimant file within 300 days of the alleged discriminatory action. Failure to follow this procedure runs the statute of limitation, rendering the claim dead. *Cf. Rosa Maldonado v. Citibank, supra.*

## A. Accrual

■ The statute of limitations commences its virtually inexorable march when the employee is notified by the employer of the discriminatory event(s). *Delaware State College v. Ricks*, 449 U.S. 250, 259, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). Although the subject of intense litigation, disagreement and subtle variations, this Circuit—following what it identifies as the majority rule—recently held that a Title VII claim is triggered when the discriminatory system or action is "actually applied to a particular employment decision." *Johnson v. General Electric*, 840 F.2d 132, 136 (1st Cir.1988).

In this case, the statute of limitation accrued when Ms. Cuello received notification that she had not been selected for each of the positions she applied for. Taking three hundred days from her filing with the administrative agency and counting as the first day the day following the accrual of the action, *see* F.R.Civ.P. 6(a), a federal cause of action exists for each of PREPA's refusal to hire Ms. Cuello after October 2, 1986.

## VI. *Local law*

Plaintiffs also seek redress for PREPA's discriminatory practices under the more expansive and liberal local discrimination statute. The statute, encoded at 29 Laws of Puerto Rico Annotated ("L.P.R.A.") § 146 states, in relevant part:

> § 146 **Discrimination for age, race, color, creed, sex, social or national origin or social position**
>
> Any employer who discharges, lays off or discriminates against an employee regarding his salary, wage, pay or remuneration, terms, rank conditions, or privileges of his work, or who fails or refuses to hire or rehire a person, or who limits or classifies his employees in any manner which tends to deprive a person of employment opportunities, or to affect his status as employee, on the basis of age, as defined hereafter, race, color, sex, social or national origin or social position, political or religious beliefs of the employee or applicant for employment:

> (a) shall incur civil liability
>
> (1) for a sum equal to twice the amount of damages sustained by the employee or applicant for employment on account of such act.

The term employer includes "... all such agencies or instrumentalities of the Government of Puerto Rico as may be operating as private businesses or enterprises." 29 L.P.R.A. § 151. Governmental agencies operating as private business or enterprises are those which function as public corporations of the Commonwealth. *See Cardona Zayas v. Depto. de Recreación y Deportes*, 91 J.T.S. 96, p. 9064 (1991). PREPA is "... a body corporate and politic constituting a **public corporation** and governmental instrumentality of the Commonwealth...." 22 L.P.R.A. 193(a). It is "... a corporation having legal existence and personality separate and apart from that of the Government." 22 L.P.R.A. § 193(b). By its terms then, PREPA is a proper defendant in an action brought pursuant to Law 100.

■ The expansive and generous nature of the statute has not gone unnoticed by this Court. In *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 609 (1985), the First Circuit recognized that the burden of proof in an age discrimination suit under § 146 is less onerous than its federal counterpart. While in Title VII actions, the burden of proof remains with the plaintiffs throughout trial, *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825, local law discards this approach. In an action under Law 100, the burden of proof shifts to defendant after plaintiffs establish the *prima facie* case. *See Wildman*, 771 F.2d at 609. Because defendant runs afoul of the more strict directives of Title VII, similarly the Court finds that defendant offends local statutory law. *Id.*

■ Under § 146, plaintiffs have one year, from the moment the employee received the notice of termination, to bring an action. *Delgado Rodríguez v. Nazario de Ferrer*, 88 J.T.S. 63, 5867 (1988). Two are the implications of the plaintiffs' action under state law. First, all claims accruing

on or after July 29, 1986, are still actionable under state law. For the period of July 29, 1986, through October 2, 1986, plaintiffs will obtain redress under state law. For those claims that accrue after October 3, 1986, plaintiffs will recover under both state and federal law. Any redundancy in this recovery will be eliminated.

Second, and more importantly, application of local law provides plaintiffs a windfall not available to Title VII plaintiffs: double the amount of monetary damages **including pain and suffering.** (Emphasis ours). This has been explicitly recognized by the Supreme Court of Puerto Rico: "Thus, we hold that when Law 100 states that civil responsibility will be for a sum equal to double the amount of damages that the [unlawful] act has caused, this means **all damages suffered by the victim, including damages for pain and suffering....**" *García Pagán v. Shiley Caribbean,* 88 J.T.S. 101, 6118 (1988).

### VII. *Section 1981 Claim*

#### A. Retroactivity of the *Patterson* Decision and Plaintiffs' Contractual Claim

 In the case at bar, this Court once more revisits the controversial yet familiar terrain associated with the recent interpretation of section 1981 by the Supreme Court. First in the agenda, this Court must consider whether *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), applies retroactively to preclude an award of damages for PREPA's failure to enter into a new contractual relationship with Ms. Cuello by failing to offer her a supervisory position. If the hands of the Court are not tied by the holding of *Patterson,* it must then consider the import of *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), and determine whether Ms. Cuello successfully entered enough evidence that her claims were not only based on her nationality but also on her ethnic characteristics or ancestry. Then, if necessary, the Court will determine whether, as a matter of law, Ms.

Cuello met the burden of proof required by § 1981.

This Circuit follows the well established rule of retroactivity announced by the Supreme Court in *Chevron Oil v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). *See, e.g., Willhauck v. Halpin,* 919 F.2d 788, 795 (1st Cir.1990). Under *Chevron,* retroactivity is not favored when:

"(1) ... it establishes a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed ..., (2) '... the merits [outweigh the] demerits [in each case by looking] to the prior history and the rule in question, its purpose and effect, and whether retrospective operation will further retard its operation ...,' and (3) ... the inequity imposed by retroactive application ... [produces] substantial inequitable results if applied retroactively...."

*Chevron Oil,* 404 U.S. at 106–07, 92 S.Ct. at 355. With this standard in mind, the Court reviews the holding of *Patterson.*

In *Patterson,* the Supreme Court—while purportedly leaving the holding of *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) intact—restricted the scope of § 1981's contract clause and held that in the employment context, the clause proscribed only discrimination in the making and enforcement of contracts. 491 U.S. 164, 109 S.Ct. 2363. The Court forbade application of the clause to what it called "post formation conduct." *Id.,* at 176–78, 109 S.Ct. at 2372. In this respect, the Court noted that application of § 1981 to other areas of employment discrimination—including interference with contractual relationships—is actionable under Title VII not § 1981.

Notwithstanding this new restrictive interpretation, the Court recognized that § 1981 still applies to proscribe intentional discriminatory conduct which prevents the formation of new and distinct contractual relationships between employer and employee. *Id.,* at 185, 109 S.Ct. at 2377.

The import of this decision, if applied retroactively, is to eviscerate the legitimate

expectation of the parties regarding the law as it stood at the time the lawsuit was commenced. At the time, the prevailing view of § 1981 was enunciated in *Rowlet v. Anheuser–Busch, Inc.*, 832 F.2d 194 (1st Cir.1987). In *Rowlet*, the First Circuit affirmed an award of compensatory and punitive damages for intentional discrimination in *training, pay raises* and discharge under both § 1981 and Title VII.[7] *Id.*, at 201–02. (Emphasis supplied). The *Rowlett* case demonstrates that *Patterson's* limitation of § 1981 was not foreseeable and contrary to the well established rule in this Circuit. That the parties could not have anticipated *Patterson's* change in the law is highlighted by the Supreme Court's unexpected and *sua sponte's* decision to order the briefing of whether the holding of *Runyon* was still good law.

Of course, PREPA has nothing to loose by advancing the *Patterson* interpretation of § 1981. The *Patterson* interpretation is certainly more restrictive and, as such, improves PREPA's chances of prevailing in this case; perhaps even retroactively snatching victory from the jaws of defeat. But in attempting to do so, PREPA does not come like a virgin to the offering altar; rather, it hopes that this Court will find reasonable the retroactive application of *Patterson.* PREPA is close but does not get the cigar.

Two other factors considered in determining retroactivity—whether the balance of equity favors retroactive application and whether retroactivity fits with the purposes of the new rule—will not alter this Court's determination of non-retroactivity. For the same reasons exhaustively expanded above, the balance of the equities favors the prospective application of *Patterson.* This Court considers the last prong: "whether retroactive application fits with the purposes of the rule" a rather baffling and unhelpful standard in this case for the answer is always in the positive if one assumes that the purpose of the new rule is to limit the application of § 1981. All this said, the last *Chevron* prong alone will not be enough to outweigh the reasonable

expectation of the parties and the balance of the equities. This Court therefore finds that (1) the law applicable to this case was well settled in the First Circuit at the time plaintiffs initiated this suit, and (2) the reasonable expectations of the parties as well as the balance of the equities militates in favor of the prospective application of the *Patterson* holding.

 ▌ Even if this Court were to find *Patterson* applicable retroactively to this case, Ms. Cuello would be entitled to recover damages for PREPA's refusal to enter into a new contractual relationship. To reach this conclusion, the Court turns to the guidance offered by the *Patterson* Court on the question of what constitutes a new contractual relationship.

Although less than the proverbial Orwellian plane of glass, the *Patterson* Court provides a workable, if chiaroscuro, outline of the applicable standard. In *Patterson*, a black woman was laid off following ten years of employment. Petitioner brought, among other claims, a § 1981 suit alleging discriminatory promotion practices and racial harassment. The Court remanded the case to the district court for further determination whether a new contract was entered into. Before doing so, the Court expressed its dissatisfaction with the holding of the appeals court that "[c]laims of discriminatory ... promotion [practices] go to the very existence and nature of the employment contract and thus fall easily within § 1981 protection." The Supreme Court stated: "We think that somewhat overstates the case." *Id.* It then added: " ... the question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." *Id.*, at 185, 109 S.Ct. at 2377.

As a beacon of light in interpreting and applying this subjective standard of what constitutes a new contract, the Court stated that lower courts must

---

7. Compensatory and punitive damages were awarded pursuant to § 1981.

... give a fair and natural reading to the statutory phrase 'the same right ... to make ... contracts,' and should not strain in an undue manner the language of § 1981. **Only when the promotion rises to the level of an opportunity for a new distinct relation between the employee and employer is such claim actionable under § 1981.**

To what extent the Court of Appeals "overstates," the reach of § 1981 is hard to understand. Notwithstanding, this Court finds that promotion of an employee from a clerk to supervisory/management position gives rise, in any reasonable mind, to a new and distinct relationship between the employer and the employee, particularly under the facts of this case.

The progression from a clerk to supervisory position epitomizes, for the average person, a break with the amorphous mass of fungible paper-pushers; a breaking through an invisible glass sphere. It is the attainment of the rank of superior; with the stature, responsibility and respect that accompanies the same. To see the opportunity for this new contractual relationship dissipate before the onslaught of impermissible discriminatory conduct and for any court to acquiesce in such practice violates the letter and the spirit of § 1981. This Court therefore finds that the *Patterson* decision does not preclude redress for Ms. Cuello under § 1981.

### B. Nationality and Race

■ Next in line, this Court determines whether the Supreme Court's interpretation of § 1981 in *Saint Francis* bars judgment for plaintiffs who assert discrimination solely on the basis of nationality.

Intended as a sword to eviscerate the racial discrimination pervasive in the 19th Century, § 1981, at a minimum, renders illegal all discrimination in the creation and enforcement of contracts. *See Tillman v. Wheaton–Haven Recreation Ass'n*, 410

U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). *But Compare Castro Franceschi v. Hyatt*, 782 F.Supp. 712 (D.P.R.1992) (Recognizing an action under the equal protection clause of § 1981).

The fact that discrimination on the basis of nationality alone is often accompanied by its evil twin—discrimination against the racial and ancestral characteristics associated with people of a particular nationality—was perhaps best explained by Mr. Justice Brennan in *Saint Francis*. He stated: "It is true that one's ancestry—the ethnic group from which an individual and his or her ancestors are descended—is not necessarily the same as one's national origin—the country 'where a person was born, or, more broadly, the country from which his or her ancestors came.' Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock was is one's own ethnic group." *Id.* 481 U.S. at 614, 107 S.Ct. at 2028 (BRENNAN, J., concurring) (citations omitted).

A relatively simple example drives the point home. While it is fair to say that a substantial segment of the national population, if not a majority, bears discriminatory animus against people of African descent, the same is absent when the person referred to is a white Africaner. In a similar manner, the mere intimation of a person's Dominican ancestry provokes, in Puerto Rico, insensitive racial comments. However, the same are exorcised when the Dominican national happens to be of white/caucasian descent. For some reason—ironic as it may seem—a number of Puerto Ricans (perhaps even a majority) bear a racial and cultural animus against nationals of the Dominican Republic not qua nationals but as non-whites.[8]

■ As discrimination under § 1981 is satisfied by the same modicum of proof necessary to establish Title VII intentional discrimination, *see Rowlett*, 832 F.2d at 201, plaintiffs can recover if at trial they

---

**8.** The irony is that Puerto Ricans, as a group, can hardly be characterized as of strictly white, caucasian descent. The mixture of Spanish, Indian, Black and European immigrants, to name a few of the ethnic influences in the island, make this Commonwealth one of decidedly mixed heritage, making it difficult for anyone to assert provenance from an unmixed white-caucasian background.

established that Ms. Cuello suffered not only discrimination because of her nationality but also because of her race.

The Supreme Court's holding in *Shaare Tefila* and this Court's interpretation of § 1981 in *Castro Franceschi* recognize the possibility that discrimination on the basis of nationality often masks an actionable evil—discrimination on the basis of race. How to disentangle the two may be a formidable task given their pernicious correlation, but the courts have deemed it wise that these closely intertwined categorizations be separated—and separate them plaintiffs must if they are to succeed. Failure to introduce direct or circumstantial evidence that bespeaks the existence of racial animus behind defendant's otherwise illegal practices should result in judgment for defendant. Although this Court previously recognized the possibility, at the dispositive motion stage, that references to discrimination on the basis of nationality are often made with regard to the person's ethnic background, *see Cuello–Suárez v. Autoridad de Energía Eléctrica de Puerto Rico*, 737 F.Supp. 1243, 1247–48 (1990); *see also Von Zuckerstein v. Argonne National Laboratory*, 760 F.Supp. 1310, 1312 (1991), evidence of discrimination on the basis of race must accompany proof of discrimination on the basis of nationality if plaintiffs' § 1981 claim is to stand.

What makes this case so hard is that at trial plaintiffs rely solely on the otherwise impressive composite report of the jobs given to less qualified individuals. The problem with this tactic is that the Court is left to infer racial discrimination from a record that only directly substantiates discrimination on the basis of nationality. In the normal case, the discrimination is not only alleged but also repeated explicitly at trial through documentary or testimonial evidence.

 Faced with this close call, the Court decides in favor of defendant. Ms. Cuello bore the burden of identifying the instances of discrimination under § 1981. She failed to show that both nationality and race played a role in defendant's discriminatory conduct. Faced with the absence of

evidence pertaining to racial animus, this Court finds for defendant on plaintiffs' § 1981 claim.

## VIII. *Damages*

 The Court now turns to a computation of damages for intentional discrimination under Title VII and local Law 100, both areas clearly demarcated by ample jurisprudence and statutory law. Because the applicable remedial section of Title VII limits relief to equitable remedies, compensatory as well as punitive damages are disallowed in Title VII actions. *See, Rosario–Torres v. Hernández Colón*, 889 F.2d 314, 321 (1st Cir.1989) (en banc); *Del Valle Fontánez v. Aponte*, 660 F.Supp. 145, 148–49 (D.P.R.1987) (Plaintiff may not recover damages for mental harm or emotional distress resulting from Title VII violation). Although plaintiffs' relief under Title VII is limited to reinstatement and back pay, *see Cardona v. Skinner*, 729 F.Supp. 193 (D.P.R.1990), the same is supplemented by local law 100 which contemplates the assessment of double compensatory damages, including therein damages for mental pain and suffering and reinstatement. 29 L.P.R.A. § 146, *et seq.* As judgment for the § 1981 claim has been entered in defendant's favor, no punitive damages will be awarded.

In assessing damages, the Court will bear in mind that plaintiffs are entitled to recover for local law violations only for the period of July 29, 1986, through October 2, 1986. From October 3, 1986, plaintiffs will recover under those provisions of Title VII and Law 100 which are not duplicates of each other. As both statutes contemplate reinstatement, Ms. Cuello's reinstatement will be at a level reflective of selection for the first supervisory job she was denied after July 29, 1986. She will also be awarded back pay pursuant to Title VII; this will include all applicable grade increases, bonuses and other compensation she would have been entitled to this day, taking into account Ms. Cuello's academic preparation and seniority.

Ms. Cuello is also entitled to damages for mental pain and suffering under local law.

At trial, Ms. Cuello testified on direct about the personal humiliation suffered at the hands of defendant; seeing her personal, academic and professional efforts shunned in favor of other employees on the basis of nationality. This evil will not go unredressed. This Court finds that pursuant to local law 100, Ms. Cuello is entitled to a compensatory damage award in the amount of $60,000.00 which doubled—pursuant to local law—yields a total of $120,000.00 for the period of July 26, 1992.

Pursuant to Law 100,[9] this Court orders PREPA to cease and desist from its discriminatory treatment of Ms. Cuello. Finally, counsel for Ms. Cuello is hereby instructed to submit—within the next ten (10) days—a motion for attorney fees and costs, as well as any memorandum of law in support thereof deemed relevant.

IT IS SO ORDERED.

---

9. Law 100, 29 L.P.R.A. § 146, states, in relevant part: "In the judgment on civil actions brought under the preceding provisions, the court may direct the employer to reinstate the employee in his former job, and to cease and desist from such action."